UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | ED CV 20-00331-AB (RAOx) | Date: | March 27, 2020 |
|---|---|---|---|

| Title: | *Xuyue Zhang*, Petitioner, *v. William P. Barr*, in his official capacity as Attorney General of the United States, *et al.*, Respondents. |
|---|---|

Present: The Honorable **ANDRÉ BIROTTE JR., United States District Judge**

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **[In Chambers] Order DENYING Defendant's Motion to Dismiss (Dkt. No. 13) and GRANTING Temporary Restraining Order (Dkt. No. 12)**

Before the Court is Petitioner Xuyue Zhang's ("Petitioner") *Ex Parte* Application for a Temporary Restraining Order ("TRO") (Dkt. No. 12) and Notice of Supplemental Authority in support thereof (Dkt. No. 14), both filed on March 23, 2020. The same day, Respondents William P. Barr *et al.* ("Respondents") filed a Motion to Dismiss Petitioner's petition for a writ of habeas corpus on the ground that Petitioner has failed to exhaust his administrative remedies. ("MTD," Dkt. No. 13). On March 24, 2020, Respondents filed an Opposition to Petitioner's TRO Application. ("Opp'n," Dkt. No 15). On March 25, 2020, Petitioner filed a Reply. ("Reply," Dkt. No. 17).

For the following reasons, the Court **DENIES** Respondents' Motion to Dismiss and the **GRANTS** Petitioner's TRO.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

On February 19, 2020, Petitioner, a 63-year-old asylum seeker and citizen of China, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his detention by U.S. Immigration and Customs Enforcement ("ICE"), asserting violations of the Due Process Clause under the Fifth Amendment to the U.S. Constitution. ("Petition," Dkt. No. 1.) His TRO asserts an additional due process violation. The following facts are undisputed.

a. **Petitioner's Detention, the IJ's Denial of Release on Bond, and Appeal of the Denial to the BIA**

On June 28, 2019, Petitioner was taken into custody by ICE and detained at the Adelanto Detention Center ("Adelanto") in Adelanto, California, where he remains detained pursuant to 8 U.S.C. § 1226(a) pending his removal proceeding. (Petition ¶¶ 1–2.)[1] Petitioner challenges his denial of release on bond by an Immigration Judge ("IJ") who found, at a July 17, 2019 hearing, that Petitioner poses no danger to the community, but poses an "extreme flight risk." (*Id.* ¶ 3, Dkt. No. 1-8.) The IJ determined that Petitioner was a flight risk because (1) he overstayed his visa, and (2) an INTERPOL Red Notice posted by China on April 15, 2016 indicated that the Chinese government had issued a warrant for Petitioner's arrest on April 27, 2014. (Dkt. No. 1-10 at 2–3.) On August 14, 2019, Petitioner appealed the IJ's bond order to the Board of Immigration Appeals ("BIA"). (Petition ¶ 5; Dkt. Nos. 1-10, 1-11.)

---

[1] On June 25, 2019, ICE Enforcement and Removal Operations Los Angeles ("ERO") received a lead referral from INTERPOL Washington, D.C. regarding Petitioner's Red Notice. (Petition ¶ 31.) On June 28, 2018, ICE issued a Form I-213 Record of Deportable/Inadmissible Alien pertaining to Petitioner, (Dkt. No. 1-5), which reports that on April 15, 2016, INTERPOL published a Red Notice for Petitioner, (Red Notice, Dkt. No. 1-6.). (*Id.*) Later on June 28, 2018, ICE officers arrested Petitioner pursuant to a targeted enforcement operation in Sierra Madre, CA. (*Id.*) ICE served Petitioner with a Notice to Appear, (Dkt. No. 1-2), charging him as a visa overstay under the Immigration and Nationality Act ("INA") § 237(a)(1)(B) [8 U.S.C. § 1227(a)(1)(B)] and determined that he will remain in ERO Los Angeles custody, pending removal proceedings, (Notice to Appear, Dkt. No. 1-3).

### b. **Petitioner's Habeas Petition and the BIA's Remand Decision**

On February 19, 2020, Petitioner filed his habeas petition in this Court while his administrative appeal of the IJ's bond order was pending before the BIA. That same day, the BIA issued a decision vacating the IJ's existing decision and granting Petitioner's request for "remand so that the [IJ] may consider previously unavailable evidence relating to whether the Red Notice is probative and reliable evidence of his risk of flight." (BIA Order of Feb. 19, 2020 at 1–2, Dkt. No. 12-4.) The BIA explained:

> We agree with the Respondent that the fact that he overstayed his visa, without more, does not support the [IJ]'s determination that he presents a risk of flight that cannot be mitigated through the setting of an appropriate amount of bond, especially in light of his employment history and property ties in the United States, his fixed address in this country, and the other equities discussed by the Immigration Judge . . . . Thus, the additional evidence regarding the reliability of the Red Notice may affect the [IJ]'s determination regarding the respondent's risk of flight, and thus his eligibility for release on bond.

(*Id.* at 2.)

### c. **Cancellation of Petitioner's March 19, 2020 Bond Hearing and Continuance to April 14, 2020**

Following the BIA's Remand Order, Petitioner's Remand Custody Redetermination (or bond) hearing was subsequently scheduled for March 19, 2020, at 8:30 a.m. before the U.S. Immigration Court in Adelanto, California. (Declaration of ICE Assistant Chief Counsel Ali Manuchehry ("Manuchehry Decl.") ¶ 3, Dkt. No. 13-2; *see also* Declaration of Thomas K. Ragland ("Ragland Decl.") ¶ 5, Dkt. No. 12-3.) Before the hearing, ICE counsel and Petitioner's counsel agreed that, before the IJ, they would stipulate to an order granting Petitioner's release on $30,000 bond and participation in the Intensive Supervision Appearance Program ("ISAP"), or ankle bracelet GPS monitoring. (*Id.*; Ragland Decl. ¶ 6.) In a March 13, 2020 email to Petitioner's counsel, ICE counsel represented that ICE would honor the terms of the parties' agreement, regardless of whether the bond hearing was held on March 19, 2020, as scheduled, or on another date. (Manuchehry Decl. ¶ 4 (citing Mar. 13, 2020 Email from Ali Manuchehry to Thomas Ragland at Dkt. No. 13-3.))

On March 19, 2020, the bond hearing did not occur as scheduled, apparently for two reasons. First, the IJ informed the parties that Petitioner had been placed in medical quarantine, for reasons still unknown to the Court, at the Adelanto ICE Processing Center. (Manuchehry Decl. ¶ 5; Ragland Decl. ¶ 7.) Second, the IJ explained that he could not proceed with the hearing because he did not have Petitioner's case file. (Manuchehry Decl. ¶ 6; Ragland Decl. ¶ 7). The hearing was then continued to April 14, 2020. (Notice of Bond Hearing, Dkt. No. 13-4.)

### d. **Petitioner's TRO Application**

On March 23, 2020, Petitioner filed the instant TRO application, asking the Court to either (1)"immediately release [Petitioner] under such conditions as the Court deems reasonable" or (2) "require[] the Adelanto Immigration Court to schedule a constitutionally-compliant bond hearing for Mr. Zhang within 48 hours of the Court's order[.]" (Dkt. No. 12-1 at 20–21.)

Petitioner contends that the IJ "refus[ed] to issue an order authorizing [Petitioner's] release based on Adelanto's purported policy barring release of any detainee subject to a quarantine," even though Petitioner was "not ill and do[es] not have a communicable disease," which Petitioner claims "resulted in an arbitrary deprivation of [his] liberty" in violation of the Due Process Clause. (Dkt. No. 12-1 at 14.) This deprivation was "arbitrary," Petitioner claims, "because it was "based on a detention facility policy, not an assessment of whether [he] poses a risk of flight or danger to the community, which are the sole legitimate justifications for detaining a noncitizen under 8 U.S.C. § 1226(a)." (*Id.* at 2).

Petitioner argues that he faces irreparable harm if he is not immediately released because (1) his "ongoing arbitrary detention itself constitutes irreparable harm," (*Id.* at 15) and (2) his "age [63] and current detention at a facility that experts believe is not able to manage a COVID-19 outbreak poses an unacceptably high risk to his health during this pandemic." (*Id.* at 16).

Respondents oppose the TRO on grounds that (1) Petitioner fails to establish a likelihood of success on the merits because: (a) he lacks Article III standing to bring the TRO motion, (b) he failed to exhaust administrative remedies (which Respondents also assert in their Motion to Dismiss), and (c) he fails to show TRO relief is warranted; (2) he fails to establish irreparable harm; and (3) the balance of equities and public interest supports denial of a TRO. (*See generally*, Opp'n).

## II.    **JURISDICTION**

Habeas corpus relief is appropriate when a person "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus proceedings are available as a forum for statutory and constitutional challenges to the authority of the Attorney General to order detention of a person. *See Zadvydas v. Davis,* 533 U.S. 678, 688 (2001). As Petitioner challenges his continued detention under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, this Court has habeas corpus jurisdiction over the claims related to his detention.

## III.    **LEGAL STANDARD**

### a.    **Legal Framework**

Upon a "warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The Attorney General has delegated the authority to redetermine custody status initially set by the Department of Homeland Security to IJs. 8 C.F.R. §§ 1003.19, 1236.1.

An undocumented immigrant held in custody under 8 U.S.C. § 1226(a) may request and receive a bond hearing before an IJ. 8 C.F.R. § 1003.19(a); *see also Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011) (citing *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008)). Detained individuals are "not limited to only one bond reduction request." *Matter of Uluocha*, 20 I&N Dec. 133, 134 (BIA 1989). They may continue to seek custody redetermination until such time as the underlying removal proceedings become administratively final. *Matter of Valles-Perez*, 21 I&N Dec. 769, 772 (BIA 1997).

If immigrant detainees held in custody under 8 U.S.C. § 1226(a) "are dissatisfied with the IJ's bond determination, they may file an administrative appeal so that 'the necessity of detention can be reviewed by . . . the BIA.'" *Leonardo*, 646 F.3d at 1160 (quoting *Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 (9th Cir. 2008)). If the BIA denies relief, detainees then "may file a petition for habeas corpus in the district court," and if the decision is unfavorable, "[t]hey may then appeal to" the Court of Appeals. *Id.* (citing *Singh v. Holder*, 638 F.3d 1196, 1200–03 (9th Cir. 2011)).

b.  **Habeas Exhaustion Requirement**

Courts in the Ninth Circuit "still apply prudential exhaustion requirements on habeas." *Sun v. Ashcroft*, 370 F.3d 932, 938 n.7 (9th Cir. 2004). *See also Leonardo*, 646 F.2d at 1160; *Castro-Cortez v. I.N.S.*, 239 F.3d 1037, 1047 (9th Cir. 2001) ("[W]e require, as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under § 2241"), abrogated on other grounds by *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006)). Generally, a bond petitioner should "exhaust[] administrative remedies" within the immigration court system "before asking the federal district court to review the IJ's decision." *Leonardo*, 646 F.3d at 1160.

"When a petitioner does not exhaust administrative remedies, a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies, unless exhaustion is excused." *Id.* "Where exhaustion of administrative remedies is not jurisdictional," as it is not required by statute, "the district court must determine whether to excuse the faulty exhaustion and reach the merits, or require the petitioner to exhaust his administrative remedies before proceeding in court." *Brown v. Rison*, 895 F.2d 533, 535 (9th Cir. 1990).

Courts may waive the exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (quoting *SEC v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 (9th Cir. 1981)).

c.  **TRO**

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Accordingly, to obtain a TRO, Petitioner must show (1) that he is likely to succeed on the merits of his claims, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

The Ninth Circuit also has an alternative to this test, under which a preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby

allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). However, the "serious questions" approach supports the court's entry of a TRO only "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The moving party bears the burden of persuasion and must make "a clear showing that" that he is entitled to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## IV. DISCUSSION

### a. Exhaustion

Respondents argue that Petitioner's habeas petition should be dismissed because he has failed to exhaust his administrative remedies. Specifically, Respondents assert that Petitioner's "release from detention at Adelanto is currently under consideration by the immigration courts, and there is high possibility that he will obtain the relief he seeks at the agency level" at a bond hearing on April 14, 2020. (Opp'n at 7). This argument does not address the unreasonable delay that Petitioner will suffer in detention during the intervening days, especially here, where both parties agree that he should not be detained. Accordingly, the Court in its discretion waives the exhaustion requirement because (1) the "administrative remedies are . . . not efficacious" and (2) "irreparable injury will result[.]" *Laing*, 370 F.3d at 1000.

The Court disagrees with Respondents' exhaustion argument that "the agency process has and will continue to provide adequate and effective relief[.]" (Opp'n at 9.) Petitioner is now entering his ninth month of immigration detention. (Reply at 6). In light of the global COVID-19 pandemic and recent court closures, the Court is concerned that the April 14, 2020 bond hearing may not proceed as scheduled, and/or that Adelanto will impose another quarantine barring Petitioner's release, especially if the situation worsens. (*See* Ragland Decl. ¶ 8 (stating that at the March 19, 2020 hearing, the IJ indicated that "conditions in the Adelanto Detention Center were chaotic."). Courts have considered that similar significant circumstances impacting government processes warrant consideration in analyzing immigrant detainees' due process claims. *See, e.g., Gonzalez v. Bonnar*, No.18-cv-05321-JSC, 2019 WL 330906, at *5 n.5 (N.D. Cal. Jan. 25, 2019) ("The Court takes judicial notice that Petitioner's detention will likely last even longer due to the partial government shutdown that occurred after briefing on this Petition. It has been widely reported that because of the shutdown thousands of immigration

hearings have been cancelled and the immigration backlog has grown significantly.") Accordingly, the Court finds that Petitioner has not been afforded an adequate and efficacious agency process under the circumstances here.

Second, as described herein, the Court finds that irreparable injury will result should Petitioner remain in detention.

Thus, the Court **DENIES** Respondents' Motion to Dismiss.

    b.    **Standing**

Article III standing contains three requirements that a plaintiff (here Petitioner) must satisfy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* Second, the injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the Court." *Id.* Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (internal citations omitted).

Respondents argue that Petitioner lacks standing to request a TRO because he fails to show "a concrete, non-hypothetical impending injury[.]" (Opp'n at 1). Specifically, Respondents assert that "Petitioner's alleged injury—that he is more likely to suffer or die from COVID 19 at Adelanto if he is not released immediately—is speculative and therefore does not raise a cognizable injury." (Opp'n at 5).

But Respondents mischaracterize the nature of Petitioner's alleged injury as being predicated solely on COVID-19. Here, Petitioner primarily challenges his detention as arbitrary on due process grounds, which he plainly has standing to do. (Dkt. No. 12-1 at 4). His current detention is a "concrete," "particularized," and "actual" injury which is "fairly . . . trac[able]" to Defendants, who hold the keys to his freedom. *Lujan*, 504 U.S. at 560. Further, it is "likely" that the injury of his detention will be "redressed by a favorable decision" if he prevails in challenging it. *Id.* at 560–61. Petitioner has standing.

//

//

    c.    **TRO**

        i.  **Serious Question Raised**

Here, Petitioner's TRO raises the following serious question under the Due Process Clause: "whether an IJ may refuse to release a person on bond—where he is indisputably eligible for release on bond and both parties have agreed upon the conditions of release—based solely on a purported detention center policy that disallows the release of any detainee subject to a quarantine, including a detainee who is not ill." (Dkt. No. 12-1 at 2). In answering "[p]lainly no," (*id.*), Petitioner argues that his ongoing detention violates the Due Process Clause, especially here where both parties have agreed upon the conditions of release, and a pandemic is ongoing that especially threatens older adults and people in immigration detention facilities, like Petitioner (*id.* at 1, 16, 18).

The Due Process Clause states that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is well-established that the Fifth Amendment guarantees non-citizens due process in removal proceedings. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *see also Oshodi v. Holder*, 729 F.3d 882, 889 (9th Cir. 2013) (en banc). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690. Due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* at 690 (internal quotations and citation omitted). In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Id.*; *Demore*, 538 U.S. at 519.

Here, the parties stipulated to release conditions, but at the bond hearing on March 19, 2019, the IJ refused to consider the stipulation, stating that, in addition to not having Petitioner's file, Petitioner could not be released for at least 2 weeks or 30 days, due to Adelanto's quarantine policy. (Ragland Decl. ¶ 8; *see also* Manuchehry Decl. ¶ 5.) The IJ continued that the earliest date on which he could conduct a bond hearing, when Petitioner would be eligible for release from quarantine, is April 14, 2020 at 1:00 p.m. (*Id.* ¶ 9).

Further, here Respondents concede that at the IJ bond hearing scheduled for April 14, 2020, Petitioner is "highly likely to be released from detention, given the

parties' stipulation," (Opp'n at 9), and that "Petitioner will presumptively soon be ordered released by the IJ," (MTD at 3). But the time period from March 19, 2020 to April 13, 2020 is not insignificant. Every passing day is a deprivation of liberty. The question remains: why prolong Petitioner's bond hearing, given the expected likelihood of immediate release and the possibility of an extended quarantine?

Ultimately the Court finds that here—where there is (1) no danger to the public if Petitioner is released, (2) a stipulation between the parties to prevent any flight risk, (3) a global pandemic by which delay in determining Petitioner's release exposes him to unnecessary risk and a potentially longer quarantine—there is at least a "serious question[] going to the merits" that Petitioner's ongoing detention constitutes a violation of the Due Process Clause. *Cottrell*, 632 F.3d at 1134–35. Here, it appears likely that Petitioner will be released, so prolonging his bond hearing may needlessly prolong his injury, especially in light of the current public health crisis. This crisis may extend Adelanto's quarantine period and ultimately interfere with Petitioner's April 14, 2020 hearing date. Thus, Petitioner raises a serious question that his ongoing detention has become unreasonably prolonged in violation of his right to due process of law under the Fifth Amendment. And an expedited hearing is an appropriate remedy. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

### ii. Balance of Hardships

Further, "the balance of the hardships tips sharply in [Petitioner's] favor" and supports Petitioner's request for an expedited bond hearing. *Cottrell*, 632 F.3d at 1134–35. Here, the Court finds very little, if any, evidence that Respondents would suffer a hardship if Petitioner were released from detention, and Plaintiff undoubtedly continues to suffer substantial hardship in detention. *See Tenorio-Serrano v. Driscoll*, 324 F.Supp. 3d 1053, 1067 (D. Ariz. 2018) (observing that "[f]orty-eight hours of unauthorized detention would impose a significant hardship on" a pretrial detainee).

First and foremost, for Petitioner, an "important interest is at stake—freedom from prolonged detention." *Diouf v. Napolitano (Diouf I)*, 634 F.3d 1087 (9th Cir. 2011). Petitioner's ongoing detention clearly constitutes a weighty hardship. Further, as noted, the IJ determined that Petitioner poses no danger to the community if he is released, and the parties have stipulated to release him on specific conditions (posting bond and GPS monitoring) under which they agree

that he presents no flight risk. Even more, Petitioner is entering his ninth month in detention and the suffering he faces in custody far outweigh any hardship articulated by Respondents. Accordingly, the Court agrees with Petitioner that the balance of hardships tips sharply in his favor.

### iii. Likelihood of Irreparable Harm

Petitioner has also shown that he is "likely to suffer irreparable harm in the absence of preliminary relief," or the grant of his TRO. *Selecky*, 586 F.3d at 1127.

Here, Petitioner claims that he faces irreparable harm absent immediate release because (1) his "ongoing arbitrary detention itself constitutes irreparable harm," (Dkt. No. 12-1 at 15), and (2) his "age [63] and current detention at a facility that experts believe is not able to manage a COVID-19 outbreak poses an unacceptably high risk to his health during this pandemic," (*id.* at 16.). The Court addresses each in turn.

### 1. Prolonged Detention

Here, Petitioner asserts that his prolonged detention, or "Respondents' continued deprivation of his liberty" violates the Due Process Clause and constitutes irreparable injury. (Dkt. No. 12-1 at 13 (capitalization altered).) "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). In the case of detained immigrants facing deportation, the risk of irreparable harm is especially high. *See Hernandez v. Sessions,* 872 F.3d 976, 994–95 (9th Cir. 2017); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[T]he preliminary injunction is necessary to ensure that individuals whom the government cannot prove constitute a flight risk or a danger to public safety, and sometimes will not succeed in removing at all, are not needlessly detained. Appellees have therefore clearly shown a risk of irreparable harm.") Here, the Court finds that each passing day Petitioner spends within the walls of Adelanto is an irreparable injury: a day of freedom he cannot get back.

### 2. COVID-19 Health Threat

Petitioner also argues that he "will face irreparable harm if he continues to languish in detention at Adelanto during this pandemic." (Dkt. No. 12-1 at 19). Respondents counter that Petitioner's claim of irreparable injury is "pure

speculation" because: (1) "Petitioner has provided no evidence that there have been any cases of COVID[-]19 in Adelanto or that ICE is not medically prepared to thwart the possibility of an outbreak," and (2) "Petitioner provides no evidence that he faces any greater risk of contracting COVID[-]19 in Adelanto than he would if released into the general public." (Opp'n at 2). But again, Respondents mischaracterize Petitioner's claim as predicated on COVID-19 alone, (Opp'n at 13), and do not address the underlying irreparable harm he articulates, that of prolonged detention.

The Court emphasizes that Petitioner challenges his ongoing detention on constitutional due process grounds, not on COVID-19 grounds.[2] Put differently, Petitioner would have the same substantive due process claim, even absent his arguments regarding COVID-19. Accordingly, this case is distinguishable from *Dawson v. Asher*, cited by Respondents, where the Court recently denied a TRO brought solely on the basis that civil immigration detainees' "detention in the face of the COVID-19 pandemic violates their Fifth Amendment right to reasonable safety while in custody." No. C20-0409JLR-MAT, 2020 WL 1304557, at *1 (D. Wash. Mar. 19, 2020).

Only as a secondary matter does Petitioner assert that "he faces a very substantial risk of being infected with COVID-19 while at Adelanto." (Dkt. No. 12-1 at 1). Finding that Petitioner's continued detention constitutes irreparable harm, the Court need not evaluate the impact of the COVID-19 public health crisis on the irreparable harm analysis.[3]

---

[2] The Court notes that Petitioner's February 19, 2020 habeas petition makes no mention of COVID-19.

[3] The Court recognizes that, in recent days, a number of courts have found that the COVID-19 pandemic does or may constitute a basis for release from detention in both the civil immigration and criminal law contexts. The Ninth Circuit, *sua sponte*, ordered the immediate release of a noncitizen detainee with a pending petition for review of her removal order "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers[.]" *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 23, 2020). A federal court in this District also "invite[d]" a defendant "to apply *ex parte* for reconsideration" of the court's prior denial of his request for release, citing "the evolving nature of the Covid-19 pandemic, particularly in the greater New York City area." *See United States v. Michael John Avenatti*, No. 8:19-00061-JVS (C.D. Cal. Mar. 25, 2020), Dkt. No. 123, Invitation to File an *Ex Parte* Request for Reconsideration. And another

### iv. **Public Interest**

Here, the public interest also weighs in favor of expediting Petitioner's bond hearing. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Rodriguez*, 715 F.3d at 1146 (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)); *see also Melendres*, 695 F.3d at 1002 (citation omitted) (noting that it is "always in the public interest to prevent the violation of a party's constitutional rights."). "The public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention" in violation of the Constitution. *Hernandez*, 872 F.3d at 996. Thus, it stands to reason that the public interest benefits from a preliminary injunction that expedites a bond hearing to ensure that no individual is detained in violation of the Due Process Clause. Further, the public has an interest in releasing Petitioner and avoiding the expenditure of government resources here, where an IJ has found that Petitioner poses no danger to the public and where the Government itself (here ICE) has stipulated to Petitioner's release on specified conditions.

Respondents counter that "the public interest in enforcement of United States immigration laws is significant," with which the Court agrees, but that interest is still upheld here, again, by and through Respondents' own stipulation to release Petitioner. (Opp'n at 15.) Petitioner still remains in removal proceedings. Respondents also argue that "the public interest is best served by allowing the orderly medical processes and protocols implemented by government professionals" at Adelanto. (*Id.*) Again, considering the parties' stipulation for release and the public interest in conserving government resources, the Court finds that purported interest non-existent.

Accordingly, Petitioner's request for an expedited bond hearing before an IJ is in the public interest.

---

federal court granted a defendant's emergency motion for reconsideration of his bail conditions, ordering his release subject to certain conditions (including location monitoring), in part because "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and "[a]lthough there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop." *See United States v. Dante Stephens*, No. 1:15-cr-00095-AJN (S.D. N.Y Mar. 19, 2020), Dkt. No. 2798, Opinion and Order.

V.     **CONCLUSION**

For the foregoing reasons, the Court **DENIES** Respondents' Motion to Dismiss and the **GRANTS** Petitioner's TRO. In granting the TRO, the Court **ORDERS** as follows:

Respondents shall schedule a bond hearing for Petitioner within 48 hours of the issuance of this Order, to be conducted by an IJ consistent with Section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a), and the BIA's February 19, 2020 Remand Order.

A hearing is hereby scheduled for April 6, 2020, at 10:00 a.m. for a hearing/status conference to determine compliance. The parties may file a stipulation to vacate this hearing if necessary.

**IT IS SO ORDERED**.